BIBB
*vs.*
BAKER'S ADM'R.
BIBB
*vs.*
SUMMERS.
BIBB
*vs.*
BIBB.

Case 29.

Bibb *vs.* Baker's Administrator.

Bibb *vs.* Summers.

Bibb *vs.* Bibb.

APPEALS FROM JESSAMINE CIRCUIT.

1. A sale by a debtor greatly embarrassed, of the whole of his property to a relative without any reasonably apparent motive for the purchase, and postponement of the payment of part of the consideration for five years, held to be fraudulent as hindering and delaying creditors.

2. It is error for the court to instruct the jury that it may find a fact to exist, when there is no testimony conducing to prove that fact.

3. A grantee who has received a bill of sale and possession of slaves, made to hinder and delay creditors, may recover the slaves of such grantor if he get the possession. (*Hawes vs. Leader*, *Croke James*, 270, *Yelv.* 196, and *John. Rep.* 163-4; *Jackson vs. Gurnsey*, 16 *John.* 191; 11 *Mass. R.* 378 ) And the fact that the conveyance was made to defraud creditors, presents no defence to an action for the recovery of the slaves.

[The facts of these cases are given in the opinion of the court.—REP.]

*Clarke & Scott* for appellant Wm. M. Bibb—

Argued: 1. That the decree in the chancery causes was erroneous—1. In deciding that the sale and conveyance from James to Wm. M. Bibb was fraudulent. 2. In refusing to regard the mortgage from Wm. M. Bibb to James Bibb, and subjecting the property to pay the debts of the creditors. 3. And in failing to give to Wm. M. Bibb a lien for the reimbursing to him the sums paid by him in discharge of the debts of James Bibb, and debts due to said Wm. M. Bibb.

2. That the circuit court erred in its instructions to the jury in permitting James Bibb to set up and rely upon fraud in his transfer of the slaves to Wm. M. Bibb, as a defense to the suit of William M. Bibb, brought to recover said slaves, of which said James had wrongfully taken possession. (*Gil-*

*lispie vs. Gillispie's heirs*, 2 *Bibb*, 91 ; *Anderson vs. Bradford*, 6 *J. J. Marshall*, 76 ; *Wickliffe vs. Lyons, Ib.* 87 ; *Isaacs vs. Gearheart*, 12 *B. Monroe*, 35.)

BIBB
*vs.*
BAKER'S ADM'R.
BIBB
*vs.*
SUMMERS.
BIBB
*vs.*
BIBB.

*Breckinridge & Beck* for appellees, creditors—

The decree in behalf of the creditors, the appellees, is right. The conveyance to Wm. M. Bibb was clearly fraudulent as to them. It is not deemed necessary to recapitulate the testimony. So far as there is a controversy between Wm. M. and James Bibb they are not concerned.

*Geo. Robertson* for appellee J. Bibb—

The original transaction between James and William M. Bibb was beyond all question a constructive fraud on the creditors of James Bibb, but not so intended or understood by James Bibb. He was not only exceedingly illiterate, but ignorant and credulous, and William M. Bibb, his nephew, had his unlimited confidence as to both capacity and integrity. He was induced to think that he might, without fraud in law, where none was intended in fact, put property in the hands of some competent friend, in trust for payment of his debts, and avoiding any injurious sacrifice. The nephew made a foul use of his uncle's misplaced confidence, and holds for his own use his uncle's whole estate for nothing. That the purpose of the transaction was fair, is abundantly evident from the proof in the case, especially Smith, who proves that James Bibb was to retain the possession of the slaves.

From the facts before the jury it had the right to infer—1. That W. M. Bibb paid nothing to J. Bibb, in money or otherwise, before the writings were executed. 2. That the transaction, tested by the face of the writings, was merely colorable, and therefore a constructive fraud on J. Bibb's creditors. 3. That so far as J Bibb was concerned, it was not intended as a fraud, and was not, therefore, a fraud in fact. 4. That as J. Bibb intended, and was induced to understand the writings, they only made his nephew a

BIBB<br>*vs.*<br>BAKER'S ADM'R.<br>BIBB<br>*vs.*<br>SUMMERS.<br>BIBB<br>*vs.*<br>BIBB.

trustee for paying his debts.   5. That so far as the writings import a different object, and have a different legal effect, they were procured by fraud, or signed through mistake.   6. That J. Bibb, understanding the writings as intending and importing a trust, the parties agreed that he should be entitled to the possession and use of the slaves, except so far as it might be necessary to hire them out to raise a fund to aid in payment of debts, or reimburse advances which W. M. Bibb might make.   7. That W. M. Bibb never was in the possession of any of them in his own right, or for his own use adversely to J. Bibb, but that the latter was at all times in the actual constructive possession of all of them.   8. That had W. M. Bibb held, as due to himself, the notes relied on by counsel as an advance payment, they would have been exhibited and cancelled when the writings were signed, and not retained by him; and, also, that they had been paid with the means of J. Bibb, as his partner or agent; and if they had not been so paid off, W. M. Bibb would not have given the note for $1,316.   And, lastly, that the account of William M. Bibb, charging those same notes, and charging 10 per cent. on every item, and still not paying the alledged price for the land and negroes by $1,000, shows that this account was made out to show what he had 'paid, or James was chargeable with, since the date of the contract, independently of the pretended payment or advance.   And on this hypothesis the jury had a right to conclude that James Bibb owes W. M. Bibb nothing; and even if he does, that William could not maintain this action on that account; and, consequently, on the whole case, they had a right to find that James Bibb had never been divested of his beneficial title, or his right to the possession; and that Wm. M. Bibb's control over the slaves, for the purpose of hiring them out, was not a possession in his own right, but for the benefit of his uncle J. Bibb, and was never adverse to that of his uncle; and that W. M. Bibb's

BIBB
*vs.*
BAKER'S ADM'R.
BIBB
*vs.*
SUMMERS.
BIBB
*vs.*
BIBB.

ranty of title, or enforce any resulting liability. But an executed contract, however fraudulent against creditors, vests in the vendee an absolute right to the property against the whole world, except creditors.

If a stranger gets possession of this property after the right is vested, it will not be pretended that he could alledge that the vendee's bill of sale, which is not sought to be enforced, but merely offered as evidence of title, was fraudulent against creditors. Yet the vesting of the title is not more complete against a stranger than it is against the vendor. The circuit court must have regarded it as an action to enforce the bill of sale. It was, on the contrary, an action for the illegal taking and detention of the slaves from the possession of W. M. Bibb, the plaintiff. James Bibb denied the unlawful taking and detention, and also denied that the slaves belonged to W. M. Bibb, or that he was entitled to the possession. It was clearly proved that J. Bibb had taken them from the possession of W. M. Bibb. The whole question turned upon W. M. Bibb's right of property. As evidence of his right of property the bill of sale was introduced. Its execution and the delivery of the slaves under it, did vest a title which J. Bibb could not impeach. If it were otherwise, all that a fraudulent vendor would have to do, would be, by stealth or force to repossess himself of property which he had fraudulently conveyed, and he would instantly be reinvested with the title. The principle of law is, " that better is the condition of the possessor," where a transaction is illegal, but an unlawful dispossessor does not destroy the rights of a lawful possessor. The unlawful taking of the property from W. M. Bibb cannot, on any right principle of law, destroy the right resulting from that possession. If the doctrine of the circuit court is correct, all fraudulent conveyances are, in effect, *revocable* by the fraudulent grantor. All that is necessary to a revocation is, either forceably or stealthily, to regain the possession, and the law at once annuls the deed. Such a doctrine would be a great encouragement to

BIBB
*vs.*
BAKER's ADM'R.
BIBB
*vs.*
SUMMERS.
BIBB
*vs.*
BIBB.

frauds, and the fraudulent grantor always safe in making them, and destroys the plainest policy of the statute of frauds, which confines the effect of fraud in annulling the instrument to the creditors or others defrauded. (1 *Stat. Law, Title Frauds; Wright vs. Wright,* 2 *Litt.,* 12; *Gillespie vs. Gillespie,* 2 *Bibb,* 91; *Dale vs. Harrison,* 4 *Bibb,* 65; *Grider vs. Graham, Ib.,* 67; *Stewart vs. Daily, Litt. Sel. Ca.,* 212; *Kendall vs. Hughes,* 7 *B. Monroe,* 371.)

In the case of *Norris vs. Norris,* 9 *Dana,* 317, the distinction is taken between an *executed* and executory contract; and while courts will not disturb the former, they will enforce the rights vested by the latter. A contrary doctrine than that on which appellants rely would lead to injustice, force, fraud, and violence.

July 3.          Chief Justice MARSHALL delivered the opinion of the court:

In October, 1841, James Bibb, then greatly embarrassed with debts, some of which had been reduced to judgment or were then in suit, after having applied, unsuccessfully to each of two brothers-in-law to take a conveyance of his property, for the purpose of protecting it from his creditors until he could have time to pay his debts, made a transfer of the . whole of it, consisting of about 74 or 75 acres of land, on which he resided, three female slaves, and various articles of personalty, to his nephew, Wm. M. Bibb. a young man who lived at his house, kept a small grocery, in which they were partners, did something at his trade as a tailor, and also did some business as a constable. The land, worth not more than eighteen or twenty dollars per acre, was conveyed by an absolute deed, duly recorded, which stated a consideration paid of $1,750; the three slaves were conveyed by an absolute bill of sale, but there was no written memorial of the sale of the personalty, nor any direct evidence of the price, which was probably included in the $1,750, stated as the consideration of the land. In part payment for the

Bibb
*vs.*
Baker's Adm'r.
Bibb
*vs.*
Summers.
Bibb
*vs.*
Bibb.

property thus transferred, Wm. M. Bibb executed his note for $1,316, payable at the end of five years, and undertook to pay certain debts of James Bibb, amounting to between $800 and $900, and for securing these payments, amounting to about $2,200, executed to James Bibb a mortgage of the same land, bearing even date with the deed and bill of sale, and which was also duly recorded.

In 1845. the administrator of Baker filed his bill against James and William Bibb, setting up a judgment against the former for upwards of $200, with executions returned, 'no property,' and praying for the foreclosure of a mortgage upon the slaves, prior to the transfer above mentioned, made for securing the same debt, but not recorded in the proper county; and afterwards, by amended bill, prayed for payment of his demand out of what might be due from William to James Bibb, on account of said transfer. Each of these parties state in their answers, that the slaves had, in good faith, and for a valuable consideration viz, $1,050, been sold, and the possession delivered by James to William Bibb, who had ever since continued to hold them, and that there was no debt from William to James except $17 28, to become due on the 25th of October, 1846. The answers were filed on the 17th of September, 1846, and in 1847 a decree was rendered in favor of the complainant for $17 28, to be paid by Wm. Bibb, and no other relief was granted.

In December, 1850, a second administrator of Baker—the first having been removed—filed his bill against the same and other parties, charging that the transfer of the land and slaves to Wm. Bibb was fraudulent, and praying that on that ground they might be subject to the satisfaction of the judgment. And about the same time Summers, who had also obtained a judgment on which executions had been returned, 'no property,' filed his separate bill against the same parties, seeking satisfaction on the same ground and by the same means. Wm. Bibb

Bibb
vs.
Baker's Adm'r.
Bibb
vs.
Summers.
Bibb
vs.
Bibb.

answered, denying the alledged fraud, and stating various particular facts and explanations. In May, 1852, James Bibb filed his answer, denying that he intended ultimately to defraud his creditors, and alledging that his intention was to place his property in the hands of Wm. Bibb, in trust, for the payment of his debts, after which so much as remained was to be restored to him; that he understood this to be the import of the writings and the effect of the transaction; that if it was otherwise he was deceived and his ignorance imposed on by his nephew, Wm. M. Bibb, who he charges, designed from the beginning to defraud him and to deprive him of his whole estate. And making his answer a cross bill against him, he seeks to charge him as trustee; and calling upon him for an account of payments made, and of profits received from the hire of the slaves, prays that the slaves may be restored to him, after satisfying any balance which may appear in favor of the trustee, who, he states, had hired out two of the slaves, Mary and Maria, for paying some of the debts, and had sold $40 worth of the personalty and 40 acres of the land for the same purpose. He also states that he had himself retained possession of the residue of the land, about one-half of the tract having been sold early in 1842—and released by Jas. Bibb—for $550, for payment of one of the debts named in the mortgage, of about $440, and that he had also retained one of the slaves, the mother of the other two.

This cross bill, with its numerous interrogatories, was answered by denials and explanatory statements on the part of Wm. Bibb, claiming the absolute ownership of the slaves, and also that the whole consideration had been paid by the defendant, William, and that James Bibb was indebted to him over $600, as shown by an account exhibited.

The cases of Baker's administrator and of Summers, against the Bibbs were consolidated, and in November, 1852, a decree was rendered declaring

technical ostensible right on the face of the bill of
sale was not only barred, but re-vested in J. Bibb by
his constructive possession in fact adverse to W. M.
Bibb's ostensible right, for more than five years.
And, therefore, the verdict cannot be set aside as
unauthorized by the evidence.

2. We insist there is no error in giving or with-
holding instructions. The fourth instruction only is
objected to, while it is admitted that if the contract
as to the right or possession was executory, it would
have been right. We think it sufficiently clear that
the possession was considered and intended to re-
main beneficially and constructively in J. Bibb, and
was never beneficially in W. M. Bibb, as proved by
Smith, the lawyer; and W. M. Bibb never had the
possession as of his own slaves, or even a transient
possession otherwise than for the purpose of hiring,
and then make formal contracts for hire, and receive
it as trust funds. The court had a right to assume,
and the jury to find, that there had been no such
possession in W. M. Bibb in his own right.

But if the court had no right to assume that fact,
nor that the parties were not in equal fault, still we
maintain that the maxim, *"in pari delicto potior est con-
ditio possedentes vel defendentes,"* applies to executed
as well as to executory contracts, and that even on
this ground the instruction was right.

The statute declaring a contract fraudulent as
against creditors only, does not legalize it as be-
tween the parties, otherwise than by leaving them
to themselves, and withholding from each of them
the aid of the law for either avoiding or upholding
it. This is the true principle of law and public pol-
icy as well settled by modern authorities. It was
not anciently, or for a long time, so adjudged. In
the case of *Hawes vs. Leader, Croke James,* 270, a
British court, not long after the enactment of the
statute of 13 Elizabeth, sustained an action at law
to enforce an executory contract admitted to be
fraudulent, and therefore void as against creditors,

Bibb
vs.
Baker's Adm'r.
Bibb
vs.
Summers.
Bibb
vs.
Bibb.

Bibb
*vs.*
Baker's Adm'r.
Bibb
*vs.*
Summers.
Bibb
*vs.*
Bibb.

and the only ground for the judgment was the assumption that as the statute declared all fraudulent contracts, executory or executed, void only as to creditors, it intended to make them as binding as *bona fide* contracts between the fraudulent parties. This, as now settled, was a misconstruction of the object and policy of the statute. But that *only* reason applied as well to executed as to executory contracts, and, consequently, if wrong as to the latter, it would be equally unavailing as to the former class. That was a leading case, and was blindly followed for many years. In *Osborne vs. Johnson,* 7 *Johns. Rep.* 161, and in *Mulen vs. Guernsey,* 16 *Ib.* 189, the supreme court of New York, on the authority of that case, applied the same false reason to executed contracts. That *only* reason has long since been exploded. It indiscriminately confounded two distinct and antipodal ideas. The true idea, that the contract was not void between the parties to it, and the idea, as a sequence, that it is in all respects, and for all purposes, binding and enforceable by legal remedies. But the latter is a legal as well as a logical *non sequitor* from the former idea. The contract is not void as between the parties, and is in one sense binding, because the law will not, as between them, avoid it; but it does not follow that it will not help either of them to uphold it, which is consistent with the letter and policy of the statute, and harmonizes with the modern maxim, that in such a case, if the parties were in equal fault in attempting a fraud on the law, that same law will not aid either of them to obtain, or to enjoy, the unlawful fruits of the prohibited contract. This maxim has been established long since the case of *Hawes vs. Leader,* which was decided more than two hundred years ago. And it is undeniable that the principle of that case is now entirely overruled by that more modern maxim which is universally applied to all such cases. And the New York decisions based on the authority of that case are entitled to no weight. See *Norris vs. Norris,* 9 *Dana,* 317, as

BIBB
*vs.*
BAKER'S ADM'R.
BIBB
*vs.*
SUMMERS.
BIBB
*vs.*
BIBB.

applicable to this case, and applies as well to an executed as to an executory contract. The law leaves each party without its pale, and will, by its remedial power, help neither of them to obtain or enjoy any advantage, possession or benefit claimed under any such prohibited contract. This seems to have been the view taken by Mr. Chitty, when he said: "But where the contract has for its object and consideration, a fraud on a third person, and both the parties to the agreement are guilty of the fraudulent intention, it seems not to be permitted to either of them to found a claim on the contract in a court of law." (*Chitty on Contracts*, 680.) Also, Judge Roan's opinion in *Winston's executors vs. Austin*, 1 *H. & M.* 42, and Judge Coulter's in *Starke's executors vs. Littlepage*, 4 *Randolph*, 375. The case of *Surlot vs. Beddoe*, 3 *Monroe*, clearly indicates that the law applies to executed as well as executory contracts.

The fourth instruction of the court was right, and contained the law of the case.

*M. C. Johnson* for appellant W. M. Bibb—

It is difficult under the unquestioned facts of this case to determine that the conveyances were fraudulent in design. The price was full and fair. The debts paid and secured, being about $1,750, were unquestionably due. It is plain, however, that the $1,316 had never been paid off, and creditors might rightfully attach the balance due on it; and to the extent of the balance due them the creditors could succeed, but no further. There was no concealment, however, of the debt, and it was secured by mortgage, of record.

By the decree in the chancery suits W. M. Bibb is entirely deprived of the land. In these suits James Bibb, by a cross-bill, charges that the whole transaction was a mortgage intended as a security merely to W. M. Bibb for the money he advanced; but that he, James, being ignorant, &c., William had taken advantage of his weakness to have the papers

Bibb
vs.
Baker's Adm'r.
Bibb
vs.
Summers.
Bibb
vs.
Bibb.

drawn wrong. He prayed for an adjustment of accounts. Soon after filing this cross-bill he got possession of the slaves, and W. M. Bibb was compelled to sue for them.

James Bibb, doubtless perceiving that he could not recover upon the settlement which he prayed for by his cross-bill, dismissed that bill, and relied on the possession thus taken of the slaves, preferring, perhaps, to risk a jury trial of the complicated accounts to the clear sifting judgment of a chancellor. He succeeded in obtaining a verdict, and W. M. Bibb appeals.

1. It is manifest that the verdict is contrary to evidence. It is clear that W. M. Bibb has paid a full and fair price for the slaves, or if the bill of sale be regarded as a mortgage, James Bibb is indebted to W. M. Bibb for money paid for them exceeding their price. In either event W. M. Bibb is entitled to the possession of the slaves; and the verdict should not be set aside.

2. The court, by its instruction, permitted James Bibb to rely on the fact that he, James Bibb, had made the bill of sale to defraud his creditors, as a bar to W. M. Bibb's recovering the possession he had of the slaves under the bill of sale, and of which Jas. Bibb had deprived him, by detaining them when they went to his house on a visit at Christmas. This instruction was erroneous. Both James and Wm. M. Bibb state on oath, that the sale was made, not to defraud creditors, but to pay them. Even in his cross bill, James Bibb swears that he had no intention to defraud his creditors, but intended a mortgage to enable W. M. Bibb to pay off his debts. But even were it otherwise, the principle that "the condition of the defendant is the better" with violators of the law, only applies to executory contracts, made in violation of law, or executory liabilities arising out of executed contracts; hence as decided in *Beddoe vs. Surlott*, 3 *Monroe*, 111, if a slave, fraudulently conveyed, is subjected to the payment of the grantor's debt, the fraudulent vendee cannot sue on the war-

Bibb
*vs.*
Baker's Adm'r.
Bibb
*vs.*
Summers.
Bibb
*vs.*
Bibb.

the conveyance of the land, so far as the same remained in possession of James Bibb—that is, except that which had been conveyed to Douglas, an innocent purchaser—to have been fraudulent, and directing that it be sold for the debts of the complainants. On the 14th of November, 1853, the land—being about one-half of the original tract—was sold for $968, which satisfied both debts, and on the 22d of the same month, on motion of James Bibb his cross bill was dismissed.

In the meantime, however, viz., at Christmas, 1852, the slaves, Mary and Maria, having each been hired out by Wm. Bibb, for the year 1852, and also contracted to be hired to the same persons for the year 1853, went, during the holidays, to the house of James Bibb, where their mother—also included in the bill of sale—had remained from the time of its execution; and James Bibb having refused to give them up to the hirers, W. M. Bibb, on the 3d of January, 1853, brought this action, for the recovery of Maria and her two children, and Mary and her two children, alledged to have been unlawfully taken out of the plaintiff's possession, by the defendant, and detained without right.

By agreement of the parties, all the depositions taken in either of the chancery suits might be read in each of these suits, and also on the trial of the action-at-law, just mentioned. And on the trial of that action nearly all of the depositions, together with the pleadings before mentioned, and the decrees, were read. And upon this and other evidence, a verdict and judgment were rendered against the plaintiff, Wm. Bibb, who has appealed from that judgment, as well as from the decree for the sale of the land.

The obvious connection between the cases sufficiently accounts for their being stated together in this opinion. We shall first consider the two chancery cases, which depend exclusively upon the question of fraud. If the case, as between James and

BIBB
*vs.*
BAKER'S ADM'R.
BIBB
*vs.*
SUMMERS.
BIBB
*vs.*
BIBB.

Wm. Bibb, had gone off upon the cross-bill, and the alledged trust had been admitted or established, and could have been enforced, the result might have done justice as between those parties; or if the transfer could have been regarded as creating a valid trust against the creditors of James Bibb, an account might have been taken, and Wm. Bibb might have been secured in any balance appearing in his favor. But he claimed the absolute ownership in all the suits, and although we are inclined to the opinion, upon a rough estimate of what he received from the estate of James Bibb, and of the demands against him, discharged or held by William, that there is a balance of several hundred dollars in his favor, yet if the transaction was fraudulent, the decree appropriating the proceeds of the land to the judgment creditors of James Bibb, cannot be reversed for the sake of the fraudulent grantee; and he must lose the balance in his favor, if any, or by gaining the slaves throw a much larger loss upon James Bibb, the fraudulent grantor.

Upon the question of fraud, it is only necessary to state that the evidence on the part of William Bibb tends to show his payment of debts of James Bibb to a considerable amount, and that he had the control and the hiring of the slaves, Mary and Maria, from the beginning of 1842 to the end of 1852, from which he admits he derived about $470, which is all, except the price of the land sold to Douglas, that he derived from the estate of James Bibb. The evidence on the other side shows his admissions, as well as those of James Bibb, that the sale was made to keep the property from creditors, or that it was a sham, or that it was only to stand until he should be repaid for his advances. It was also proved that on several occasions James Bibb had stated to persons either applying to buy property or to get their debts paid, that he had nothing, and had sold all to William. The statements of both parties, in answer to the bill of the first administrator of Baker, have al-

1. A sale by a debtor greatly embarrassed, of the whole of his property to a relative, without any reasonably apparent motive for the purchase, and postponement of the payment of part of the consideration for 5 years, held to be fraudulent as hindering and delaying creditors.

BIBB
vs.
BAKER'S ADM'R.
BIBB
vs.
SUMMERS.
BIBB
vs.
BIBB.

ready been noticed. As against the creditors of J. Bibb, his statements proving a real sale, were not admissible, but the admissions of vendor and vendee, in derogation of the sale, were competent evidence, and certainly tend strongly to establish the fraudulency of the transfer as to creditors.

But above all this, we think fraud is stamped upon the very face of the transaction, because no motive is shown for the purchase, by Wm. Bibb, of the various articles of property included in the sale, because it was made by an embarrassed debtor, and embraced every article of his property, and because, while a portion of the consideration is not disclosed, but is represented as paid, another large part—nearly one-half of the whole—is payable only at the end of five years; by which means, while the property itself is to be put out of the reach of creditors, by the transfer, only about one-third of the price is openly applied to the payment of debts, and nearly one-half of it is postponed and inaccessible for the most unreasonable period of five years. Such a transfer necessarily hinders and delays creditors, and the indebtedness being known to both parties, both must be regarded as concurring in the intention to produce the injurious effect. And the inference is scarcely to be resisted, that it was the expectation and intention of the parties, that whatever value was paid, or should be paid, by the vendee, would be reimbursed by the property, which, or a large portion of it, was thus to remain for the benefit of the vendor. The allegation of the vendee, that on all payments outside of the mortgage, and also for the annual rent of the land and annual hire of the slave retained, he was to have ten per cent. interest, until the maturity of his five years note, then to be credited with the principal and that rate of interest, does not tend to give validity to the transaction, or to remove any unfavorable inference; and we think there was no error in subjecting the land to sale for the demands set up in the two bills.

BIBB
*vs.*
BAKER'S ADM'R.
BIBB
*vs.*
SUMMERS.
BIBB
*vs.*
BIBB.

Wherefore, the decree in each of the two first cases named at the head of this opinion is affirmed.

The additional evidence introduced on the trial at law did not materially vary the case as to the question of fraud. And certainly the case, upon the evidence, is of such a character as requires that a new trial should be granted, unless the instructions were either absolutely correct or of such a character as to repel the presumption that the jury was misled by them. We think the instructions are not of a character to sustain the verdict on either of the grounds mentioned.

2. It is error for the court to instruct the jury that it may find a fact to exist, when there is no testimony conducing to prove that fact.

The second instruction given for the defendant, authorizes the jury, even if they believe that the contract, as written, was an absolute sale for a valid consideration, to find that by a subsequent arrangement or understanding of the parties, the beneficial or legal title was vested in the defendant without writing, and if they so found, the original contract of sale would not authorize a recovery. Upon this we observe that there is no evidence tending to prove that there was any subsequent agreement of the kind supposed. The admissions and statements of the parties, as proved by the witnesses, evidently relate to the original transaction, and give no intimation of any subsequent variation. The answer and cross-bill of James Bibb is to the same effect, and does not claim or suggest any change. The instruction also seems to authorize the jury not to believe that the written contract was an absolute bill of sale, when it is palpably so.

The first, third, and fourth instructions authorize the jury to find that the possession and legal title was intended to be vested in the plaintiff, in trust to hire out, &c., and that if, through ignorance or mistake, or the fraud of plaintiff, the defendant signed the paper, the possession would not be adverse, but the contract should be considered as a trust, and that if the debts named in the mortgage were paid by

the plaiutiff the title re-vested in the defendant. And, by the fifth instruction, the jury was told that if they believed, as stated in the third, and that by the real contract the plaintiff was entitled to the possession only so far as might be necessary for a sale, he could not recover.

BIBB
vs.
BAKER'S ADM'R.
BIBB
vs
SUMMERS.
BIBB
vs
BIBB.

There is no evidence, except in the defendant's answer and cross-bill, above noticed, either that he executed the bill of sale in ignorance or through mistake, or that its execution was procured by the fraud of the plaintiff. Nor is there any evidence even that the transaction, in which it was executed, was instigated by the plaintiff; but all the evidence on that subject shows that the defendant was the actor in the business. And, further than this, the tenor of each and all of these instructions is to authorize the jury to pass over the question of fraudulent intent as to creditors, if they believe there was a trust between the parties for the benefit of the vendor, and to give effect to that trust in opposition to the terms of the written bill of sale, when the very existence of such a trust is one of the strongest evidences or badges, if it is not the very essence of fraud. And so it has been considered ever since Twine's case, decided soon after the enactment of the Statute of Elizabeth.

The sixth instruction is, that if, at the instance, or with the voluntary concurrence, of the plaintiff, the bill of sale was made to defraud creditors of the defendant, the plaintiff cannot recover, unless he had been more than five years in adverse possession of the slaves.

The question is thus fairly presented, whether in the case of an executed conveyance, the grantee can recover the property conveyed from the grantor himself, if the latter shows that the conveyance was in fraud of his creditors, or whether the maxim, *in pari delicto potior est conditio defendentis*, or *possidentis*, applies in such a case for the protection of the defendant.

3. A grantee who has received a bill of sale and possession of slaves, made to hinder and delay creditors, may recover the slaves of such grantor if he get the possession.

Bibb
vs.
Baker's Adm'r.
Bibb
vs.
Summers.
Bibb
vs.
Bibb.

(*Hawes vs Leader, Croke James, 270, Yelv. 196, and John Rep. 163-4; Jackson vs. Gurnsey, 16 John. 191; 11 Mass. R. 378.*) And the fact that the conveyance was made to defraud creditors, presents no defense to an action for the recovery of the slaves.

The case of *Hawes vs. Leader, Croke James,* 270, and *Yelv.* 196, stated also in *Osborn vs. Moss,* 7 *Johnson's Rep.,* 163-4, is directly in point to establish the right of recovery in such a case, and to deny to the fraudulent vendor any right of defense against a recovery upon an executed conveyance, by showing that it was made to defraud his creditors. The case of *Osborn vs. Moss* is to the same effect; as is also the case of *Jackson vs. Gurnsey,* 16 *John. Rep.,* 191. In that case the court says, although the deed was probably executed to defraud creditors, yet it was binding upon the parties and their representatives. In the case of *The inhabitants of Worcester vs Eaton,* 11 *Mass. Rep.,* 378, though the question was presented in a somewhat different aspect, the principle asserted is substantially the same, or at least covers the question. In that case a party claimed to avoid his own conveyance of land, on the ground of fraud, and having entered for that purpose, brought an action to recover it. The court, in denying the right claimed, said: "A deed of bargain and sale, signed, sealed, delivered, acknowledged, and recorded, is an actual transfer of the land to the grantee, as much as the delivery of a sum of money or a personal chattel is a transfer of one of those." And an absolute bill of sale, especially if accompanied or followed by possession, stands precisely on the same footing as to the property transferred.

It is said, however, that the case of *Hawes vs. Leader,* and the two cases in New York, which blindly follow it, are not to be regarded as evidence of the law. We are not, however, referred to any authority which overrules them, except so far as it is contended that the case of *Surlot vs. Beddoe,* 3 *Monroe,* 111, and that of *Norris vs. Norris,* 9 *Dana,* establish the principle that the maxim, *in equali juri potior est conditio defendentis,* may in some cases be relied on by a defendant who is sued on a contract, fraudulent as to the creditors of such defendant. But neither of these cases applies the maxim to a case where the plain-

tiff founds his right of recovery immediately upon an executed conveyance of the property in question, vesting the title in him. The first was an action, founded on an alledged promise to pay the price of a slave, which the court, in effect, said could not be implied, in a case where the defendant's slave, fraudulently conveyed to the plaintiff, had been sold under execution against the vendor, and in favor of his creditor ; and the other was upon a covenant, express or implied. These were cases of executory contracts, as much so as a promissory note or a covenant of warranty in a deed of conveyance. And if it were conceded that these cases depart—with regard to executory contracts—from the principle of *Hawes vs. Leader*, and the other cases which follow it—all of which relate to executed conveyances—it would not follow that they should be regarded as requiring or authorizing a departure from the precise principle established with reference to executed conveyances. We have been referred to no case which decides that a plaintiff, claiming by virtue of a legal title to recover property conveyed to him by the defendant, may be defeated in the recovery, by the fact that the conveyance was made by the defendant in fraud of his own creditors. Certainly a stranger to the transaction, not a creditor nor a *bona-fide* purchaser under either of the parties, could not avail himself of such a fact to protect his possession. And unless the deed is less effectual against the maker than against strangers, it would seem that the defense should be equally unavailing to the fraudulent party himself.

Upon the question of policy involved in this question, we do not deem it necessary to enlarge. The policy of the statute is to give effect to the fraudulent transaction, as between the parties. There is more doubt whether this policy is not violated by allowing one of them to defeat an action against him, on an executory part of the transaction, than there is of its being violated by allowing, as between the parties,

BIBB
*vs.*
BAKER'S ADM'R.
BIBB
*vs.*
SUMMERS.
BIBB
*vs.*
BIBB.

full effect to an executed conveyance, in fraud of creditors.

We are of opinion that this sixth instruction was erroneous.

Wherefore, the judgment, in the case of Wm. M. Bibb against James Bibb. is reversed, and the cause remanded for a new trial, on principles consistent with this opinion.

[A petition was filed for a rehearing, but overruled by the court.]